UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

CARLOS ACEVEDO,

                           Plaintiff,

          v.

CAROLYN W. COLVIN, *acting Commissioner of Social Security*,

                       Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
14-CV-5514 (MKB)

MARGO K. BRODIE, United States District Judge:

     Plaintiff Carlos Acevedo filed the above-captioned action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for Supplemental Security Income ("SSI"). Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Pl. Notice of Mot. for J. on the Pleadings, Docket Entry No. 23; Pl. Mem. of Law ("Pl. Mem."), Docket Entry No. 24; Pl. Reply Mem. of Law ("Pl. Reply"), Docket Entry No. 27.) The Commissioner cross-moves for judgment on the pleadings, arguing that the decision of Administrative Law Judge Kieran McCormack (the "ALJ") is supported by substantial evidence and should be affirmed. (Comm'r Notice of Cross-Mot. for J. on the Pleadings, Docket Entry No. 25; Comm'r Mem. of Law ("Comm'r Mem."), Docket Entry No. 26.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion for judgment on the pleadings is denied.

## I. Background

     Plaintiff is a fifty year-old man with a high school education. (R. 79, 112–13, 198.)

Plaintiff has no past relevant work experience. (R. 113.) Plaintiff applied for SSI on April 5, 2011 due to depression, rheumatoid arthritis, asthma and back pain, with an alleged disability onset date of September 30, 2000. (R. 79–85, 197.) Plaintiff's application for SSI was denied on August 31, 2011, (R. 129, 133), and he timely requested a hearing before an ALJ, which was held on November 21, 2012, (R. 53, 89). On December 14, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act (the "Act"). (R. 27–41.) Plaintiff appealed the ALJ's decision to the Appeals Council. (R. 25.) On June 23, 2014, the Appeals Council denied Plaintiff's request for review. (R. 11, 15.)

### a. Plaintiff's testimony

At the start of the hearing, Plaintiff explained his various impairments.[1] Plaintiff has had difficulty breathing since he underwent a tracheotomy in 1995. (R. 98–99.) As a result of the tracheotomy procedure, Plaintiff has a permanent tube inserted into his neck, which he uses to breathe because his vocal cords are paralyzed. (R. 107.) Plaintiff has difficulty walking and needs oxygen to sleep. (R. 99.) Plaintiff uses a nebulizer at least once a day and uses an oxygen tank every night to sleep. (R. 111.) Plaintiff suffers from asthma, and his most recent asthma attack occurred a "few years ago." (R. 99.) Plaintiff has lumbar radiculopathy, a herniated lumbar disc, spinal stenosis, a herniated cervical spine and arthritis in his knees. (R. 100.) Plaintiff has had rheumatoid arthritis since he was six or seven years old and received SSI throughout his childhood and until he was incarcerated in or around 1999 or 2000. (R. 98, 101.) Plaintiff does not take psychiatric medications or visit a psychiatrist. (R. 99–100.)

Plaintiff described the manner in which his impairments affect his life. Plaintiff typically

---

[1] At the hearing, Plaintiff amended his alleged disability onset date from September 30, 2000 to April 5, 2011, the date of his application. (R. 94–95, 231.)

begins his day by removing his tracheotomy collar from the oxygen tank that he uses while he sleeps. (R. 104.) Thereafter, Plaintiff stretches, which he finds uncomfortable, takes his medication, showers, dresses himself, and then sits either in his recliner or outside in front of his home, weather permitting. (*Id.*) As a result of his back and neck pain, Plaintiff feels "stiff" and "very tight" in the mornings and has difficulty moving. (R. 102.) Plaintiff dresses himself but with difficulty. (R. 105.) In addition, it is uncomfortable for Plaintiff to shower or sit. (*Id.*) He has to sit in order to bathe himself and to put on his shoes. (R. 111–12.) Plaintiff cannot sit in one place for "too long" and feels "very" uncomfortable unless he changes positions regularly. (R. 110.) Plaintiff cannot cook or do chores. (R. 105–06.) Because Plaintiff has difficulty preparing his lunch and dinner, either his brother or mother prepare his meals. (R. 104.) Plaintiff has a driver's license and can drive sometimes, but he cannot use public transportation. (R. 106.) Plaintiff has trouble climbing the two and one-half steps to the entrance to his home. (R. 102.) Plaintiff uses a cane whenever he leaves his home because he has poor balance as a result of his back pain. (R. 109.) Plaintiff has difficulty walking on uneven surfaces and has fallen while walking. (R. 109–10.) He wears a back brace when he moves. (R. 122.) Plaintiff cannot lift more than one pound. (R. 108.)

Plaintiff has constant back pain and takes Percocet and Oxycontin to relieve his pain. (R. 102.) The pain is worse in colder weather. (R. 108–09.) The medication "takes the edge off" the pain but does not completely relieve it, (R. 102), and it makes him feel drowsy. (R. 110.) Plaintiff's doctors have not recommended surgery for his lumbar disc stenosis and herniated cervical disc because the procedure could worsen, rather than improve, these conditions. (R. 103.)

### b.  Medical evidence

#### i.  Beth Israel Medical Center

From April of 2001 through at least October of 2012, Plaintiff met with healthcare personnel at Beth Israel Medical Center ("Beth Israel").

#### 1.  Dr. Nilufer Guleyupoglu, M.D.

Dr. Nilufer Guleyupoglu, M.D., began treating Plaintiff in 2004 and provided palliative care for his back and knee pain on a regular basis through at least 2012.

#### A.  Medical procedures

Dr. Guleyupoglu performed various procedures in an effort to alleviate Plaintiff's back and knee pain.  On December 14, 2004, Dr. Guleyupoglu diagnosed Plaintiff with lumbar radiculopathy and administered a lumbar epidural steroid injection.  (R. 491–93.)  Plaintiff received additional lumbar epidural steroid injections on March 4, March 22, May 12, December 2 and December 16 of 2005 and on January 6, 2006.  (R. 496, 502, 509, 515, 521, 528.)  Five years later, on April 22, 2011, Plaintiff received a lumbar epidural steroid injection from Dr. Guleyupoglu, who at that time, diagnosed Plaintiff with lumbar radiculopathy, lower back pain and facet joint arthropathy.  (R. 327.)

On April 11, 2008, Dr. Guleyupoglu performed radiofrequency thermal ablation on Plaintiff, which alleviated Plaintiff's back pain.  (R. 308–09.)  Dr. Guleyupoglu diagnosed Plaintiff with facet joint arthropathy with lower back pain.  (R. 308.)  Dr. Guleyupoglu performed radiofrequency thermal ablation on April 9 and May 5 of 2010; January 21, February 11 and October 7 and 21 of 2011; and March 2, August 3, and October 3 of 2012.  (R. 375–76, 339–40, 446, 533, 545, 563, 569.)  After each procedure, Dr. Guleyupoglu diagnosed Plaintiff

with "lumbar spondlyosis without myelopathy with facet arthropathy with lower back pain" and noted that Plaintiff reported that his pain had decreased. (*Id.* (capitalization omitted).)

On July 15, August, 28, September 11, September 25, October 2, October 16 and October 30 of 2009, Plaintiff received injections of Synvisc into his knees from Dr. Guleyupoglu. (R. 282–88.) After each procedure, Dr. Guleyupoglu diagnosed Plaintiff with osteoarthritis "with [p]ain" in both knees and noted that Plaintiff reported some relief of his pain. (*Id.*) On July 6, July 15 and July 29 of 2011, Dr. Guleyupoglu administered Orthovisc injections to Plaintiff's knees. (R. 315, 316, 433.) After each procedure, Dr. Guleyupoglu diagnosed Plaintiff with osteoarthritis "with [p]ain" in both knees and noted that Plaintiff reported that his pain was reduced. (R. 315, 316, 433.)

On March 28 and June 27 of 2008 and on February 13, 2009, Dr. Guleyupoglu performed a median branch nerve block on Plaintiff, and she diagnosed Plaintiff with "[f]acet [a]rthropathy with low[er] back pain." (R. 300, 307–10.) Plaintiff reported that he received some back pain relief and was able to bend his spine. (R. 300.)

On November 12, 2010, Dr. Guleyupoglu performed bilateral superior occipital nerve blocks and trigger point injections on Plaintiff. (R. 351.) After the procedures, Plaintiff reported improvement in his pain and that he was able to bend his spine. (*Id.*)

On March 23 and June 22 of 2012, Dr. Guleyupoglu administered trigger point injections to Plaintiff. (R. 551, 557.) Plaintiff reported that he received some relief from the pain and was able to bend his spine backward without pain. (*Id.*) Dr. Guleyupoglu diagnosed Plaintiff with "myositis/myalgias with muscle spasms, taut bands with back pains." (R. 557 (capitalization omitted).)

On September 10, 2010 and December 21, 2011, Dr. Guleyupoglu administered a

bilateral sacroiliac joint injection to Plaintiff. (R. 360, 539.) Dr. Guleyupoglu diagnosed Plaintiff with "[s]acroilitis with [s]acroiliac [a]rthropathy and [l]ow[er] back [p]ain" and noted that Plaintiff reported decreased pain after the procedure. (R. 539.)

## B. Follow up visits

Dr. Guleyupoglu also saw Plaintiff for "follow up visits."[2] On March 3, 2008, Plaintiff visited Dr. Guleyupoglu, because of chronic back pain, and reported his pain intensity as eight on a scale of ten. (R. 311.) At the time, Plaintiff was taking Mylanta, Advair, Proventil, Augmentin p.r.n., Prilosec, Miacalcin, Opana ER, Lyrica, Ultracet p.r.n., Lidoderm and Zanaflex. (*Id.*) Dr. Guleyupoglu's notes indicate that she reviewed a November 15, 2006 magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine, which revealed an intervertebral disk bulge resulting in a mild foraminal stenosis, a bulging of the annulus fibrosis and spondylosis. (*Id.*) She also reviewed an August 17, 2007 MRI of Plaintiff's cervical spine, which revealed a paracentral herniated disk and cervical lymphadenopathy. (*Id.*) Following a physical examination, Dr. Guleyupoglu found that Plaintiff's lower extremities exhibited a full range of bilateral motion. (R. 312.) Plaintiff's "bilateral SLR" test was negative, and his "FABER" test was positive on the left and negative on the right. (*Id.*) A spinal exam indicated that Plaintiff had a limited range of motion "secondary to pain," (*id.*), and Dr. Guleyupoglu observed that Plaintiff's gait was normal and that Plaintiff could ambulate independently, (*id.*) Dr. Guleyupoglu noted that Plaintiff was functionally independent. (*Id.*) Dr. Guleyupoglu's diagnosis was "chronic low[er] back pain, lumbar facet arthropathy, sacroiliac arthropathy with a history of vocal cord paralysis, status post tracheostomy and . . . functional asthma, rheumatoid

---

[2] Dr. Guleyupoglu's comments concerning Plaintiff's follow up visits are memorialized in several notes contained in the record.

arthritis, degenerative joint disease, and substance abuse." (*Id.*)

On August 12, 2008, Plaintiff visited Dr. Guleyupoglu and presented the same complaints discussed above, and Dr. Guleyupoglu's examination findings were the same as those discussed above.[3] (R. 304–05.) Dr. Guleyupoglu reported that Plaintiff's pain levels were "still not [at] a level that the patient can tolerate" and noted that, in the past, Plaintiff had a better response to the "combination of interventional approaches and medications." (R. 305.) Dr. Guleyupoglu increased Plaintiff's dosage of Zanaflex and Lyrica and renewed his other medications. (*Id.*)

On December 16, 2008, Plaintiff visited Dr. Guleyupoglu and reported his pain intensity as ten on a scale of ten and noted that the pain was aggravated by sitting or walking. (R. 301.) Dr. Guleyupoglu examined Plaintiff and noted that a "FABER" test was negative. (R. 302.) An examination of his spine revealed that there was "tenderness to palpitation over" Plaintiff's right facet joints. (*Id.*)

On March 3, 2009, Plaintiff visited Dr. Guleyupoglu. (R. 297.) Plaintiff reported that he was experiencing more pain with ambulation and when he changed positions, but less pain when sitting. (*Id.*) His lower back pain had improved but he reported pain in his "right lower abdominal area." (*Id.*) His pain intensity was eight on a scale of ten. (*Id.*) Dr. Guleyupoglu's examination revealed a soft abdomen with bowel sounds and "[t]enderness to palpation to the lower abdomen." (R. 298.)

On April 28, 2009, Plaintiff visited Dr. Guleyupoglu. (R. 293.) He complained of lower back pain and knee pain, reporting a pain intensity of ten on a scale of ten. (*Id.*) The pain was

---

[3] The Court notes only changes in Dr. Guleyupoglu's examination findings and diagnoses.

preventing him from sleeping and "completely affecting his quality of life and function." (*Id.*) Dr. Guleyupoglu examined Plaintiff and noted that an "SLR" test was questionable on the right leg and that both of Plaintiff's knees had crepitus. (R. 294.) A patella compression test and a "McMurray" test of Plaintiff's right knee were both positive. (*Id.*) Dr. Guleyupoglu determined that Plaintiff's gait was mildly antalgic. (*Id.*) In addition to the medications Plaintiff was taking, Dr. Guleyupoglu prescribed Voltaren gel for Plaintiff's knees. (*Id.*)

On June 30, 2009, Plaintiff visited Dr. Guleyupoglu. (R. 289.) He reported severe pain in his right knee and lower back, which prevented him from sleeping. (*Id.*) He rated the intensity of the pain as ten on a scale of ten. (*Id.*) Dr. Guleyupoglu determined that Plaintiff had a "new onset right abdominal radiating into right groin and testicle area pain." (R. 290.)

On December 8, 2009, Plaintiff visited Dr. Guleyupoglu. (R. 278.) Plaintiff reported pain in his knees and lower back with an intensity of ten on a scale of ten, which prevented him from sleeping and made walking painful. (*Id.*) Plaintiff reported that the injections in his knees had resulted in an improvement to the pain in his right knee but had not reduced the pain in his left knee. (*Id.*) Plaintiff also reported that his left knee could not bear any weight. (*Id.*) Dr. Guleyupoglu examined Plaintiff's knees and discovered "significant edema of the left knee with no ballottement." (R. 279.) Plaintiff was unable to fully extend his left knee and his gait was severely antalgic. (*Id.*)

On January 19, 2010, Plaintiff visited Dr. Guleyupoglu. (R. 381.) Plaintiff rated his pain as ten on a scale of ten. (*Id.*) Plaintiff reported that the pain in his left knee prevented him from sleeping and made walking painful, and that he could not bear any weight on his left knee. (*Id.*) Dr. Guleyupoglu examined Plaintiff's knees and noted "mild swelling" of Plaintiff's left knee. (R. 382.) A patella compression test of Plaintiff's knees was positive as to Plaintiff's left knee

but negative as to his right knee.  (R. 381–82.)

On March 30, 2010, Plaintiff visited Dr. Guleyupoglu.  (R. 377.)  Plaintiff reported that his knees were better, but he still had severe lower back pain with an intensity between eight and nine on a scale of ten.  (*Id.*)  Dr. Guleyupoglu noted that Plaintiff's knees were not swollen. (R. 379.)

On June 1 and 22 of 2010, Plaintiff visited Dr. Guleyupoglu.  (R. 367, 371.)  On both occasions, Plaintiff reported that his back pain had an intensity of 7.5 on a scale of ten, which made it painful to stand, sit, lay down or twist.  (R. 367–369, 371–73.)  On both occasions, Dr. Guleyupoglu's examination of Plaintiff's spine revealed a limited range of motion and diffuse muscle spasms.  (R. 369, 373.)

On July 27, 2010, Plaintiff visited Dr. Guleyupoglu.  (R. 361.)  He reported severe lower back pain that radiated down his legs.  (*Id.*)  Plaintiff rated his pain intensity level as eight on a scale of ten generally, but varying between a low of six and a high of 9.9.  (*Id.*)  Plaintiff stated that his pain was at the higher level "about 70% of the time." (*Id.*)  He reported that the radiofrequency ablation alleviated the pain for two months but the effects were "wearing off." (R. 362.)  Although Plaintiff felt that his analgesic doses were not strong enough, he did not want a higher dose because of "the side effects of fatigue and forgetfulness" caused by his pain medications, and he did not want to renew some of the other pain medication prescriptions.  (*Id.*) Dr. Guleyupoglu examined Plaintiff and found that an "SLR" test and a "FABER" test were "positive on the right side; negative on the left side" and that an iliac compression test was negative.  (R. 363–64.)  Dr. Guleyupoglu's examination of Plaintiff's spine revealed palpable spasms of the upper back that were "rock hard" and "tender to touch" but no abnormal curvature or sway; Plaintiff's lumbosacral spine exhibited a limited range of motion on "extension,

rotation, and bends due to pain"; his paraspinal and lumbar facets were not "tender on palpation"; his right "SI" was very tender on palpation, but his left was less tender. (R. 363–64.) Dr. Guleyupoglu added to Plaintiff's diagnosis lumbar spondylosis without myelopathy, disc herniations and chronic intractable back pain. (R. 364.)

On October 7, 2010, Plaintiff visited Dr. Guleyupoglu and rated the "overall" intensity of his pain as eight on a scale of ten. (R. 356.) Plaintiff reported that his pain would vary between a low of six and a high of 9.9 and that his pain was at the higher level "about 70% of the time." (*Id.*) Dr. Guleyupoglu examined Plaintiff's spine and found that his cervical spine had "full functional range of motion" and there was "no provocation of pain" but that there were "palpable spasms of the upper back." (R. 358.)

On November 2, 2010, Plaintiff visited Dr. Guleyupoglu. (R. 352.) Plaintiff reported that he had neck pain during the week prior to his visit and that the intensity of his back pain was the same as he previously reported. (*Id.*) Dr. Guleyupoglu examined Plaintiff and determined that he had "provocation of pain with palpation of the [o]ccipital notches bilaterally," "diffuse muscle spasm of the paraspinals with tenderness/taut bands bilaterally," and also noted that Plaintiff's "SI's" were not tender. (R. 354.) Dr. Guleyupoglu observed that Plaintiff's gait was only mildly antalgic. (*Id.*)

On November 30, 2010, Plaintiff visited Dr. Guleyupoglu. (R. 347.) He reported that the injections had reduced his level of pain. (*Id.*) Plaintiff rated his overall pain intensity as four on a scale of ten. He also reported that his neck pain had decreased and that his back pain was manageable. (*Id.*) Dr. Guleyupoglu's examination revealed no "provocation of pain with palpation of the [o]ccipital notches bilaterally" and a "decrease in the muscle spasm of the paraspinals with tenderness/taut bands bilaterally." (R. 349.)

On January 11, 2011, Plaintiff visited Dr. Guleyupoglu. (R. 347.) He reported increased pain in his right buttock and right leg and pain in his back, and he rated his overall pain intensity as eight on a scale of ten. (R. 341.) Plaintiff also reported being depressed and requested a referral to a psychiatrist. (R. 342.) Dr. Guleyupoglu's cervical spine examination revealed "provocation of pain with palpation of the occipital notches bilaterally," "diffuse muscle spasm of the paraspinals with tenderness/taut bands bilaterally," and "severe spasms of the left thoracic paraspinals." (R. 343.)

On March 8, 2011, Plaintiff visited Dr. Guleyupoglu. (R. 333.) Plaintiff reported that he initially felt pain relief after his most recent radiofrequency ablation, but two weeks later, he had experienced a dramatic increase in pain. (*Id.*) The pain made it difficult for him to concentrate and communicate, and it disrupted his sleep. (R. 334.) Dr. Guleyupoglu examined Plaintiff and noted that an iliac compression test was positive on Plaintiff's right side. (R. 335.) Dr. Guleyupoglu noted "increased pain with lumbar extension" and that "[l]umbar right and left lateral rotation and bends provoke[d] pain in the right flank region." (R. 336.)

On May 10, 2011, Plaintiff visited Dr. Guleyupoglu. (R. 322.) Plaintiff reported that he was feeling better than he had felt during his prior visit, and he rated his pain intensity level as seven on a scale of ten. (*Id.*) Plaintiff also reported that he could "not remain in any single body position for more than 10 minutes" or "sit for more than 10–20 minutes." (*Id.*) Dr. Guleyupoglu examined Plaintiff and noted crepitus in both of Plaintiff's knees, and that "bilateral SLR" was negative, "reverse SLR" was "bilaterally negative" and "bilateral FABER" was negative on the left side of Plaintiff's body. (R. 324)

On June 7, 2011, Plaintiff visited with Dr. Guleyupoglu. (R. 317.) He reported improvement in his lower back pain, which he rated as five on a scale of ten, but he rated the

pain in his knees as nine.  (R. 317.)  Dr. Guleyupoglu examined Plaintiff and noted that right lateral motion caused more pain than left lateral motion.  (R. 319–20.)

On August 9 and September 6 of 2011, Plaintiff visited Dr. Guleyupoglu.  (R. 424, 429.)  On August 9, Plaintiff rated his pain intensity as an eight "plus" on a scale of ten and a seven on a scale of ten on September 6.  (*Id.*)

### 2.  Other medical treatment at Beth Israel

In addition to the treatment he received from Dr. Guleyupoglu, Plaintiff received other medical treatment at Beth Israel.

On April 6, 2001, Plaintiff had a computerized tomography ("CT") scan of his lumbosacral spine, which revealed a "[s]light posterior bulging of disc at L4-L5 level." (R. 275–76.)  On November 26, 2001, Dr. Jonathan R. Moldover, M.D., administered a facet joint injection to Plaintiff, (R. 483), and on January 28, 2002, Dr. Moldover performed a medial branch block on Plaintiff, (R. 487).  Dr. Moldover diagnosed Plaintiff with facet arthropathy. (R. 483, 487.)

On November 8, 2004 and on January 10, 2005, an ear, nose and throat physician at Beth Israel diagnosed Plaintiff with chronic sinusitis.  (R. 273–74.)  On May 3, 2005, Plaintiff underwent a CT scan of the paranasal sinus, which revealed "[p]resumed inflammatory change bilateral maxillary sinuses in association with mucosal disease within the drainage pathways." (R. 271–72.)

A January 31, 2006 MRI of Plaintiff's "cervical soft tissues" revealed "no evidence of cervical soft tissue mass" and "[d]iffuse cervical lymphadenopathy."  (R. 258.)

Plaintiff also underwent a series of MRIs of his lumbar spine.  An October 11, 2008 MRI revealed central disk protrusions.  (R. 256–57.)  A July 11, 2009 MRI revealed a mild annular

bulge in addition to the previously discussed central disk protrusions. (R. 252–53.) A March 31, 2011 MRI of his lumbar spine revealed a herniated disc leading to foraminal stenosis. (R. 250–51.)

A December 1, 2009 MRI of Plaintiff's left knee revealed "tricompartmental osteoarthritis and ankylosis of proximal tibiofibular joint," "evidence of prior arthroscopy and presumed prior partial medial and lateral partial meniscectomy," and small joint effusion. (R. 254–55.)

On March 1, 2011, Plaintiff went to Beth Israel for an urgent visit and was seen by Dr. Jan Slomba, M.D. (R. 338.) Plaintiff complained of a severe exacerbation of his lower back pain. (*Id.*) Dr. Slomba's examination revealed that Plaintiff was in mild acute distress but appeared calm and pleasant, that Plaintiff could ambulate without support, but that his gait was antalgic. (*Id.*) The range of motion of Plaintiff's lumbar spine was "painfully decreased" and there was a diffuse moderate tenderness along the lumbar paraspinal muscles. (*Id.*) Dr. Slomba advised Plaintiff to continue with his prescribed pain medication, temporarily increasing his Percocet dosage, and he prescribed a Medrol pack. (*Id.*) Lumbar spine x-rays revealed "[m]ild disc space narrowing" and "[m]ild multilevel endplate osteophyte formations." (R. 470.)

### ii. Dr. Louis Tranese, consultative examiner

On August 22, 2011, Plaintiff underwent a consultative orthopedic examination with Dr. Louis Tranese, D.O., after a referral from the Division of Disability Determination. (R. 417.) Plaintiff complained of "constant, daily, low[er] back pain," which frequently radiated to the right leg, rating the pain as an eight on a scale of ten. (*Id.*) Plaintiff's back pain was aggravated by "sitting or standing [for] long periods" and by "sudden movement such as twisting, bending, heavy lifting, and walking long distances." (*Id.*) The pain was relieved "moderately" by

changing position, rest and the multiple pain medications Plaintiff was consuming. (*Id.*) Plaintiff used a cane prescribed by his primary care doctor. (R. 418.)

On examination, Dr. Tranese noted that Plaintiff did not appear to be in acute distress and had a "normal" gait. (*Id.*) He determined that Plaintiff had difficulty with heel to toe walking and "was unable to squat beyond 30% of maximum capacity" because of his back pain. (*Id.*) He opined that Plaintiff's cane was medically necessary but only for "long distance" and outdoor ambulation. (*Id.*) He observed that Plaintiff was able to rise from his chair without difficulty and did not need any help changing for his examination or with getting on and off the examination table. (*Id.*) Dr. Tranese determined that Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally and no "cervical or paracervical pain or spasm" or "trigger points." (*Id.*) Plaintiff's thoracic and lumbar spine showed "[f]lexion [thirty] degrees limited by pain, full extension, lateral flexion [ten] degrees bilaterally, and rotary movements [ten] degrees bilaterally all limited by pain." (*Id.*) Dr. Tranese noted that Plaintiff complained of "bilateral mid-to-lower lumbar paraspinal tenderness." (*Id.*) He also noted that Plaintiff's straight leg raising test was negative while seated and positive at sixty degrees while supine. (*Id.*) Dr. Tranese determined that Plaintiff exhibited sacroiliac joint tenderness but no sciatic notch tenderness. (*Id.*) Plaintiff exhibited mild-to-moderate lumbar paraspinal spasm bilaterally but no scoliosis, kyphosis or trigger points. (*Id.*)

Dr. Tranese diagnosed Plaintiff with "discogenic low[er] back pain with radicular symptoms," a history of "tracheotomy secondary to vocal cord paralysis" and a history of hypertension and asthma. (*Id.*) Dr. Tranese found that Plaintiff had "moderate-to-marked restrictions with heavy lifting and frequent bending, squatting, and kneeling," "mild-to-moderate

limitations with long distance ambulation or frequent stair climbing" and "mild limitations with standing for long periods." (R. 419–20.) Dr. Tranese opined that Plaintiff had "no other physical functional deficits." (R. 420.)

### iii. Dr. Michael Alexander, Ph.D.

On August 22, 2011, Dr. Michael Alexander, Ph.D., conducted a consultative psychiatric examination of Plaintiff. (R. 387–90.) Plaintiff reported "a history of dysphoric moods since the 1990s" and told Dr. Alexander that he had difficulty falling asleep and had some loss of appetite. (R. 387.) Plaintiff reported that he had never been hospitalized for psychiatric care and that he last received psychiatric care in the 1990s, while he was incarcerated. (*Id.*) Plaintiff denied having "suicidal and homicidal ideation." (*Id.*)

Dr. Alexander noted that Plaintiff was "cooperative, friendly, and alert" and that his manner of relating and social skills were adequate. (R. 388.) He observed that Plaintiff walked very slowly using a cane, his posture and motor behavior were normal, and his eye contact was appropriate. (*Id.*) He determined that Plaintiff's expressive and receptive language were "adequate for normal conversation," and his thought processes were "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the exam." (*Id.*) Plaintiff's affect was "of full range and appropriate in speech and thought content." (*Id.*) Plaintiff had a neutral mood and clear sensorium. (*Id.*) Plaintiff's attention, concentration, and recent and remote memory skills were all intact. (R. 388–89.) Plaintiff's intellectual functioning was average, and his insight and judgment were adequate. (R. 389.)

Dr. Alexander diagnosed Plaintiff with dysthymic disorder. (*Id.*) Dr. Alexander found that Plaintiff could "follow and understand simple directions," "perform simple tasks independently," "maintain attention and concentration," "maintain a regular schedule," "learn

new tasks," "perform more complex tasks independently," "make appropriate decisions," "relate adequately with others" and "appropriately deal with stress." (*Id.*) Dr. Alexander did not find any evidence of panic or manic-related symptoms, thought disorder or cognitive deficit. (R. 387.) Dr. Alexander concluded that the results of the examination were "consistent with psychiatric problems which [alone] are not significant enough to interfere with the claimant's ability to function on a daily basis." (R. 389.) Dr. Alexander recommended "individual counseling for depressed mood" and noted that the prognosis was "good." (R. 390.)

### c. Non-medical evidence

#### i. Function report

On July 22, 2011, Norman B. Colwell, Plaintiff's friend, completed a "Function Report" on Plaintiff's behalf, detailing Plaintiff's activities and limitations. (R. 211–223.) According to the report, Plaintiff lives in an apartment with his family. (R. 211.) During the day, Plaintiff showers, eats breakfast and prepares his medications. (R. 212.) Plaintiff's injuries and conditions affect his sleep. (*Id.*) Plaintiff experiences discomfort and some pain dressing himself but bathing provides temporary pain relief. (*Id.*) Plaintiff prepares breakfast, lunch, and dinner every day and performs very limited cleaning and laundry. (R. 213–14.) Plaintiff goes outside his home when his condition allows and for appointments with his doctor. (R. 214.) He travels by car and by using medical transportation. (*Id.*) Because of his poor balance, Plaintiff only occasionally goes outside alone. (R. 214–15.) Plaintiff shops for groceries every two weeks. (R. 215.) He practices his hobbies, which include building models, reading, and playing dominoes, as often as possible. (*Id.*) Plaintiff visits his doctors two to three times per month. (R. 216.) Plaintiff's severe back pain, limited vocal cord paralysis, tracheotomy and asthma affect his abilities to lift, stand, walk, sit, climb stairs, kneel, squat, reach, use his hands, see, hear

and talk.  (R. 216–17.)  Plaintiff follows spoken and written instructions but sometimes has trouble with his memory.  (R. 218–19.)  Plaintiff described the pain he experiences as a result of his condition as a sharp, stabbing, burning sensation, which began at age six. (R. 219–20.)  He feels the pain in his lower back, upper spine, knees and throat.  (R. 220.)  Plaintiff's pain is aggravated by walking, sitting, or standing for too long, and he experiences uninterrupted pain every day.  (*Id.*)  Plaintiff takes pain medication, and he does not experience any side effects from the medication.  (R. 221.)  Plaintiff also uses a back brace and sometimes uses a cane to relieve his pain.  (*Id.*)

### ii.    Residual functional capacity assessment

On August 31, 2011, "J. Ortega" reviewed Plaintiff's medical file and completed a residual functional capacity ("RFC") assessment, diagnosing Plaintiff with "HNP lumbar spine." (R. 405–10.)  Ortega noted multiple exertional limitations, including Plaintiff's ability to (1) "lift and/or carry" ten pounds occasionally and less than ten pounds frequently, (2) "stand and/or walk" with normal breaks for a total of at least two hours in an eight-hour workday, (3) sit with normal breaks for a total of "about" six hours in an eight-hour workday, and (4) "push and/or pull" without limitation, other than those limitations for lifting and carrying.  (R. 406.)  Ortega found that Plaintiff's postural limitations were "secondary to" his back pain and "ROM limitations" and that Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl.  (R. 407.)  Ortega found that Plaintiff's environmental limitations were "secondary to" his tracheotomy and history of asthma and that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and other known respiratory irritants.  (R. 408.)  Ortega did not observe any manipulative, visual, or communicative limitations.  (R. 407–08.)  In support of these findings, Ortega noted that:

> [Plaintiff] is a 45 year old male with allegations of back pain. MRIs on file show small central disc herniations L4/5 with mild-to-moderate right lateral recess stenosis; right lateral herniated disc L3/4 leading to mild to moderate right forminal stenosis and deviating the right L3 nerve root. MRI of the left knee shows tricompartmental OA and ankylosis of the proximal tib[ia]-fib[ula] joint as well as evidence of prior arthroscopy. [Plaintiff] has history of asthma that he describes as well controlled with singulair, advair and albuterol rescue inhalers. No asthma related ER visits in past year. [Plaintiff] has a capped tracheotomy secondary to vocal cord paralysis in 1995. CE examination 08/23; [Plaintiff] ambulates with normal gait, some difficulty with heel/toe walking and squat to 30% secondary to pain. [Plaintiff] presented with assistive device that the CEMD opines appears to be medically necessary for long distance, outdoor ambulation as it provides [Plaintiff] with reassurance. [Plaintiff] needed no help changing for exam, getting on/off table and was able to rise from chair without difficulty. Limitations in ROM L–spine secondary to pain: flex 30 degrees, full extension, lat flex 10 degrees b.l, rotary movement 10 degrees b/l all limited by pain. Mild paraspinal spasm, no sciatic notch tenderness. Extremities: all ROM full, full strength, no effusion, inflammation, instability, sensory or motor deficits noted.

(R. 406–07.) Ortega concluded that the totality of evidence in Plaintiff's file supported an RFC to perform "the full range of sedentary work." (R. 410.) Considering Plaintiff's age, education and RFC, Ortega concluded that a denial was "appropriate." (*Id.*)

### d. Vocational expert testimony

Vocational expert Yaakov Taitz testified by telephone at the hearing before the ALJ. (R. 113–121.) The ALJ asked Taitz to consider the following hypothetical:

> Assume an individual with the claimant's age, education, and work experience. Assume that this individual can perform the full range of sedentary work. However, this individual can climb, balance, stoop, kneel, crouch, crawl, bend, and squat on an occasional basis. Assume further this individual cannot work at jobs containing concentrated exposure to airborne irritants such as fumes, odors, dusts, and gases.

(R. 113.) Taitz testified that such an individual could work as an envelope addresser, ticket counter or document preparer, which entail sedentary work with an SVP of "2." (R. 114–15.)

The ALJ presented another hypothetical, asking Taitz to assume the first hypothetical person, but added that the hypothetical person could only "lift/carry five pounds occasionally, stand and walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday." (R. 115.) Taitz testified that such an individual could work as an envelope addresser, ticket counter or document preparer. (R. 116–17.) The ALJ presented a third hypothetical, asking Taitz to assume the second hypothetical person, but added that the hypothetical person could only lift or carry three pounds rather than five. (R. 117.) Taitz testified that such a limitation would eliminate two of the jobs he cited before.[4] (R. 117–18.) Taitz also testified that all three of the jobs he cited would permit an individual to both sit and stand. (R. 121.) In response to a hypothetical proposed by Plaintiff's counsel, Taitz testified that there would be no jobs available if the individual needed to be absent from work four or more times per month, "during the cold months," or if the individual was "off task" twenty five percent of the day as a result of side effects caused by pain medication. (R. 119.)

### e. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA under the authority of the Act. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 5, 2011, the alleged onset date of his disability. (R. 32.) Second, the ALJ concluded that Plaintiff has the following severe impairments: lumbar disc herniations and radiculopathy, cervical disc herniation, osteoarthritis of the knees, status post tracheotomy and a history of asthma.[5] (*Id.*) Third, the ALJ determined that Plaintiff does not have an impairment

_____

[4] Taitz did not specific which two. (*See* R. 118.)

[5] The ALJ concluded that Plaintiff's dysthymic disorder is not severe because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (R. 32.) To support his finding that Plaintiff's dysthymic disorder lacked sufficient

or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the SSA Regulations. (R. 34.) The ALJ found that no medical source presented findings or opinions that Plaintiff's impairments, by themselves or in combination, equaled the criteria of any listed impairment. (*Id.*) The ALJ gave specific consideration to Section 1.02, pertaining to major dysfunction of a joint, and Section 1.04, pertaining to disorders of the spine. (*Id.*)

Fourth, the ALJ determined that Plaintiff "has the residual functional capacity to perform sedentary work," subject to the following limitations: Plaintiff "can lift/carry five pounds occasionally; can stand and walk for 2 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; and can occasionally climb, balance, stoop, kneel, crouch, crawl, bend, and squat." (*Id.*) The ALJ also found that Plaintiff "cannot work at job sites containing concentrated exposure to airborne irritants such as fumes, odors, dust, and gases." (*Id.*) The ALJ also concluded that Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 35.)

In reaching this conclusion, the ALJ relied on Dr. Guleyupoglu's June 7, 2011 and September of 2011 examinations, in which "Dr. Guleyupoglu noted that the claimant is functionally independent," (R. 36), and Dr. Guleyupoglu's opinion that, as a result of

---

severity, the ALJ referenced Dr. Alexander's August 22, 2011 examination, in which Plaintiff reported symptoms of "sleep difficulty, loss of appetite, and a history of dysphoric moods." (R. 33.) After examining Plaintiff, Dr. Alexander "reported only normal findings" and concluded that Plaintiff's "psychiatric problems are not significant enough" to interfere with his "ability to function on a daily basis." (*Id.*) The ALJ gave this opinion "significant" weight because he found it was supported by Dr. Alexander's examination findings, Plaintiff's "independence with his activities of daily living," and Plaintiff's testimony that he does not take medication, and is not in treatment, for his psychiatric problems. (*Id.*)

"radiofrequency thermal ablation procedures," Plaintiff "had excellent pain relief and significant improvement in functional level and general level activity," (R. 37). The ALJ also relied on Dr. Tranese's opinion that Plaintiff has "moderate-to-marked restriction with heavy lifting, frequent bending, frequent squatting, and frequent kneeling; mild-to-moderate restriction with long distance ambulation and frequent stair climbing; mild limitations with standing for long periods"; and "no other physical functional defects." (R. 36–37.) The ALJ accorded "significant" weight to Dr. Tranese's opinion because it was supported by Dr. Tranese's examination findings, Dr. Guleyupoglu's findings that Plaintiff is functionally independent, and Dr. Guleyupoglu's findings that Plaintiff responded well to the radiofrequency thermal ablation procedures. (R. 37.)

Finally, the ALJ determined that Plaintiff had no past relevant work. (*Id.*) The ALJ concluded that, given Plaintiff's age, education, work experience, RFC and the vocational expert's testimony that an individual with Plaintiff's RFC could perform work as an addressor, ticket checker and document preparer, there were a significant number of jobs in the national economy that Plaintiff could perform. (R. 37–38) Therefore, the ALJ determined that Plaintiff was not suffering from a "disability" as defined under the Act. (R. 38.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted). In deciding whether substantial evidence exists, the court "defer[s] to the

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d

118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial

evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations

omitted). If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b.  Availability of benefits

SSI is available to individuals, among others, who are "disabled" within the meaning of

the Act.[6]  For purposes of SSI eligibility, to be considered disabled under the Act, a plaintiff

must establish his or her inability "to engage in any substantial gainful activity by reason of any

---

[6] SSI is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a), 1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is disabled.

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be of "such severity that he is not

only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy." *Id.* § 1382c(a)(3)(B). The Commissioner has promulgated a five-step analysis for

evaluating disability claims. 20 C.F.R. § 416.920. The Second Circuit has described the steps as

follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed. If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work. If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations. When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled. However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work. Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any other
> work. If the claimant satisfies her burden of proving the
> requirements in the first four steps, the burden then shifts to the
> [Commissioner] to prove in the fifth step that the claimant is capable
> of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (describing "the

five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing

20 C.F.R. § 416.920(a)(4)(i)–(v))).

    **c.**   **Analysis**

    Plaintiff moves for judgment on the pleadings arguing that the ALJ's (1) assessment of

Plaintiff's RFC, (2), assessment of Plaintiff's credibility and (3) determination that Plaintiff could perform other jobs that existed in significant numbers in the national economy were not supported by substantial evidence. (Pl. Mem. 1.) The Commissioner argues that the ALJ's decision is supported by substantial evidence. (Comm'r Mem. 1.)

### i. The RFC assessment is not supported by substantial evidence

The Commissioner argues that the ALJ's RFC determination was supported by the findings and opinion of the consultative examiner, Dr. Tranese, to whose opinion the ALJ gave significant weight. (Comm'r Mem. 21.) Plaintiff argues that neither the ALJ nor Dr. Tranese assessed Plaintiff's ability to sit and that the ALJ did not account for some of the limitations noted in Dr. Tranese's opinion. (Pl. Mem. 14; Pl. Reply 3.)

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id.* § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id.* In determining the RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-0803, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(b–e))). "Because an RFC determination is a medical determination, an ALJ who

makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (first citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); and then citing *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

"Before an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.*, whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he 'must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . .'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *4). The Second Circuit has held that failure to conduct an explicit function by function analysis at the RFC finding step is not *per se* error requiring remand, but it has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record." *Id.* at 177.

The ALJ determined that Plaintiff could perform "sedentary work"[7] except that he is

---

[7] Sedentary work is defined as work that:
> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Brown v. Colvin*, --- F. Supp. 3d ---, ---, 2015 WL 7313877, at *2 n.1 (W.D.N.Y. Nov. 20, 2015) (quoting 20 C.F.R. § 404.1567(a)).

limited to lifting and carrying five pounds "occasionally," standing and walking for "2 hours in an 8-hour workday," sitting for "6 hours in an 8 hour workday," and "occasionally" climbing, balancing, stooping, kneeling, crouching, crawling, bending and squatting. (R. 34.) In reaching his RFC determination, the ALJ relied on three pieces of evidence: (1) Dr. Guleyupoglu's finding that Plaintiff was functionally independent, (2) the fact that Plaintiff reported relief from his pain as a result of the radiofrequency thermal ablation and steroid injections, and (3) Dr. Tranese's opinion that Plaintiff had "moderate-to-marked restrictions with heavy lifting and frequent bending, squatting, and kneeling," "mild-to-moderate limitations with long distance ambulation or frequent stair climbing," "mild limitations with standing for long periods," and "no other physical functional deficits." (R. 35–37.)

Dr. Guleyupoglu's finding that Plaintiff was functionally independent does not support the ALJ's RFC determination because it is not clear from the record what Dr. Guleyupoglu meant when she noted that Plaintiff was functionally independent. In her notes memorializing Plaintiff's visits, Dr. Guleyupoglu listed "functionally independent" as the final comment under "physical examination" without explaining what she meant by "functionally independent." (*E.g.*, R. 379 (capitalization omitted).) However, in her "assessment" of Plaintiff, where Dr. Guleyupoglu noted her medical conclusions, she never noted that Plaintiff was "functionally independent." (*See, e.g.*, R. 343–44 (capitalization omitted).) The ALJ appears to have concluded that Dr. Guleyupoglu's "functionally independent" comments referred to Plaintiff's "independence with his activities of daily living." (*See* R. 37.) However, to reach this conclusion, the ALJ ignored many of Dr. Guleyupoglu's other observations. Dr. Guleyupoglu noted Plaintiff's consistent complaints about the ways in which his pain was impairing his life, indicating for example, that Plaintiff could "not walk more than one half of a city block," would

lose his balance when standing still, and could not "remain in any single body position for more than [ten] minutes." (*See, e.g.*, R. 322.) Dr. Guleyupoglu concluded that Plaintiff's back pain was "affecting his activity levels, his mood and his quality of life." (*See, e.g.*, R. 325.)

Moreover, Dr. Guleyupoglu's "functionally independent" comments do not support the ALJ's RFC because there is no indication that the comments are related to Plaintiff's ability to perform sedentary work. *See Primes v. Colvin*, No. 15-CV-6431, 2016 WL 446521, at *4 (W.D.N.Y. Feb. 5, 2016) (remanding because, in part, the ALJ "did not explain" how the plaintiff's daily activities, like climbing stairs, "is the equivalent of the ability to perform the exertional and nonexertional demands of light work" (collecting cases)); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983) (finding that a claimant's testimony regarding his daily activities and the ALJ's observation that the claimant "sat still for the duration of the hearing and was in no evident pain or distress" did not support the ALJ's determination that the plaintiff had the "residual functional capacity for at least sedentary work" because "[t]here was no proof that [the claimant] engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job"). The ALJ had a duty to develop the record in order to determine what Dr. Guleyupoglu meant by stating that Plaintiff was "functionally independent," before relying on these comments to conclude that Plaintiff could perform sedentary work.[8] *See Doria v. Colvin*, No. 14-CV-7476, 2015 WL 5567047, at *7

---

[8] Although a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . 'because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration omitted) (first citing *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); and then quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)); *see also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) ("Unlike a judge at trial, the ALJ has a duty to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (quoting *Vincent v.*

(S.D.N.Y. Sept. 22, 2015) ("The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination." (citing *Corporan v. Comm'r of Soc. Sec.*, No. 12-CV-6704, 2015 WL 321832, at *30 (S.D.N.Y. Jan. 23, 2015))); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 279 (N.D.N.Y. 2009) ("[A]n ALJ has an affirmative duty to develop the record, even if the claimant is represented by counsel, if the medical record is ambiguous or incomplete." (first citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); and then citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))).

The ALJ's reliance on the fact that Plaintiff reported relief from his pain as a result of the radiofrequency thermal ablation and steroid injections was improper because the ALJ failed to acknowledge the contradicting evidence contained in Dr. Guleyupoglu's records that the radiofrequency thermal ablation and steroid injections were not successful in spite of the temporary relief Plaintiff reported immediately following these procedures. For example, on March 8, 2011, Plaintiff reported that while the radiofrequency thermal ablation he received on February 11, 2011 initially reduced his pain, he had a dramatic increase in pain two weeks later. (R. 333.) Moreover, on September 6, 2011, after receiving steroid injections, nerve blocks, and radiofrequency thermal ablation for over five years, Dr. Guleyupoglu noted that Plaintiff still reported "feeling more pain just like before," that his "back pain [wa]s returning," that he was "still having pain in every bone," and that he could "not sit for more than 10–20 minutes." (R. 424–425.) The ALJ's failure to address the contradictory evidence contained within Dr. Guleyupoglu's records, and his selective citations to Dr. Guleyupoglu's records, undermine his

---

*Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011))). This duty is present "[e]ven when a claimant is represented by counsel." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (collecting cases); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) ("[T]he ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel . . . .").

conclusion that these procedures relieved Plaintiff's pain. *See Poles v. Colvin*, No. 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (holding that, where the ALJ omitted records that undermined his conclusion that the plaintiff did not think her mental health issues were affecting her functioning, the ALJ's conclusion was "improperly based on a selective citation to, and mischaracterization of, the record" and "not supported by substantial evidence" (citing *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009))); *Arias v. Astrue*, No. 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) (noting that "[t]he ALJ may not simply ignore contradictory evidence . . . the ALJ must acknowledge the contradiction and explain why the conflicting [evidence] is being disregarded").

Finally, Dr. Tranese's opinion was not an adequate basis for determining Plaintiff's RFC. The ALJ based his determination regarding Plaintiff's limitations[9] on Dr. Tranese's opinion that Plaintiff had "moderate-to-marked restrictions with heavy lifting and frequent bending, squatting, and kneeling," "mild-to-moderate limitations with long distance ambulation or frequent stair climbing," "mild limitations with standing for long periods," and "no other physical functional deficits." (R. 419–20.) However, the terms Dr. Tranese used to describe Plaintiff's limitations, such as "mild" and "moderate," are too vague to be the sole medical support for the ALJ's specific functional assessments that Plaintiff could, for example, lift and carry five pounds occasionally or stand and walk for two hours in a six-hour workday. *See Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("[The consultative examiner's] opinion is remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent'

---

[9] The ALJ determined that Plaintiff could perform "sedentary work" except that he is limited to lifting and carrying five pounds "occasionally," standing and walking for "2 hours in an 8-hour workday," sitting for "6 hours in an 8 hour workday," and "occasionally" climbing, balancing, stooping, kneeling, crouching, crawling, bending, and squatting. (R. 34.)

is left to the ALJ's sheer speculation. . . . [The consultative examiner's] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative examiner's "statement that [the] [p]laintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate basis for determining [the] [p]laintiff's RFC" because it "did not provide enough information to allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work").

Because there is no medical evidence supporting the ALJ's RFC determination that Plaintiff could perform sedentary work, the ALJ was obligated to develop the record and obtain a functional capacity assessment from Plaintiff's treating physician. *See Marshall v. Colvin*, No. 12-CV-6401, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 30, 2013) ("Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." (first citing *Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594 (E.D.N.Y. Sept.11, 2012); and then citing *Myers v. Astrue*, No. 06-CV-331, 2009 WL 2162541 (N.D.N.Y. July 17, 2009))); *Aceto v. Comm'r of Soc. Sec.*, No. 08-CV-169, 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC.")  Accordingly, the Court remands this case pursuant to 42 U.S.C.

§ 405(g) for further proceedings.

### ii. Remaining arguments

Plaintiff argues that the ALJ's conclusion that Plaintiff was not credible as to the intensity, persistence and limiting effects of his impairments was not based on substantial evidence. (Pl. Mem. 10.) Plaintiff further argues that the ALJ's determination that Plaintiff could perform other jobs that existed in significant numbers in the national economy was similarly not supported by substantial evidence. (*Id.* at 15.) Defendant argues that the ALJ's determinations are supported by substantial evidence. (Comm'r Mem. 23–26.)

"It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting *Carroll*, 705 F.2d at 642)). While an ALJ must "take the claimant's reports of pain and other limitations into account," he or she "is not required to accept the claimant's subjective complaints without question." *Rock v. Colvin*, --- F. App'x ---, ---, 2015 WL 5780585, at *1 (2d Cir. Oct. 5, 2015) (quoting *Genier*, 606 F.3d at 49). Rather, the ALJ evaluates the claimants' contentions of pain through a two-step inquiry. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged," including pain. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)); *Henningsen v. Comm'r of Soc. Sec. Admin.*, 111 F. Supp. 3d 250, 268 (E.D.N.Y. 2015) (quoting *Genier*, 606 F.3d at 49). If so, "the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Genier*, 606 F.3d at 49 (alterations and internal quotation marks omitted) (citing 20 C.F.R. § 404.1529(a)); *Henningsen*, 111 F. Supp. 3d at 268 (quoting *Genier*, 606 F.3d at 49).

At the second stage, the ALJ must first consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012). To the extent that a claimant's allegations of pain "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry."[10] *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (first citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii); and then citing *Taylor v. Barnhart*, 83 F. App'x 347, 350–51 (2d Cir. 2003)).

The fifth step of a disability determination requires an ALJ to determine whether there are significant numbers of jobs in the national economy that a claimant can perform. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v)). An ALJ may base this determination either on the Medical Vocational Guidelines or the testimony of a vocational expert. *Id.* An ALJ who relies on the testimony of a vocational expert must ensure that "there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion" and that those assumptions "accurately reflect the limitations and capabilities of the claimant involved." *Id.* (first quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983); and then citing *Aubeuf v.*

---

[10] In conducting the credibility inquiry, the ALJ must consider the following seven factors:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

*Meadors v. Astrue*, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

*Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)).

In assessing Plaintiff's credibility, the ALJ concluded that, while Plaintiff's physical impairments could "reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]." (R. 35.) As the Court has found the ALJ's RFC determination is not supported by substantial evidence, the ALJ is directed to reevaluate his determination as to Plaintiff's credibility on remand. *See Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 78 n.5 (2d Cir. 2012) (where the ALJ's credibility determination was based on his RFC finding, the court directed the ALJ to reassess his credibility determination in light of the court's holding that the RFC finding was not supported by substantial evidence). Similarly, because the ALJ's determination that Plaintiff could perform work that exists in significant numbers in the national economy was based on Plaintiff's RFC, the ALJ must also reconsider this determination. *See id.* ("[S]ince the vocational expert's testimony relied on a RFC that is not supported by substantial evidence, on remand the Commissioner is directed to re-assess the weight it gave to the testimony of [the] vocational expert . . . .")

### III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted. The Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's decision is vacated and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 28, 2016
      Brooklyn, New York